IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KARL MARKOWICZ  :
                          :
      Plaintiff,  :
                          :    No. 4:11-cv-00439
      v.  :
                          :    (Judge Brann)
SWEPI LP, as Successor-in-Interest  :
to EAST RESOURCES, INC.;  :
ULTRA RESOURCES, INC.,  :
                          :
      Defendants.  :

## MEMORANDUM

April 12, 2013

For the following reasons, defendants' motion for summary judgment is

granted; plaintiff's motion for summary judgment is denied.

## I.    The Complaint

Plaintiff-lessor Karl Markowicz ("Karl" or, where unambiguous,

"Markowicz") asks this Court to void a lease under which defendants-lessees,

SWEPI LP ("SWEPI") and Ultra Resources, Inc. ("Ultra"), are permitted to

explore and exploit Markowicz's land for oil and gas. Markowicz claims he is

entitled to relief because (1) he never signed the lease (Rec. Doc. No. 6 ¶ 18 ); (2)

his mother, Beverly Markowicz ("Beverly"), who signed for him, was without

"right or authority" to do so (Id. at ¶¶ 19-20); and (3) Beverly's own signature was

fraudulently induced by a representative of defendants (Id. at ¶¶ 22-25).

## II.    Summary Judgment Standard

The parties have filed cross-motions for summary judgment. Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" where it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" where "the evidence is such that a reasonable jury," giving credence to the evidence favoring the nonmovant and resolving all inferences in the nonmovant's favor, "could return a verdict for the nonmoving party." Id.

Where the moving party's motion is properly supported, the nonmoving party, to avoid summary judgment in his opponent's favor, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed must" be supported by "materials in the record" that go beyond mere allegations, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce

admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). See also

Anderson, 477 U.S. at 248-50. "If a party fails to properly support an assertion of

fact or fails to properly address another party's assertion of fact as required by

Rule 56(c), the court may . . . consider the fact undisputed for purposes of the

motion." Fed. R. Civ. P. 56(e)(2). The Court may even give credence to "evidence

supporting the moving party that is uncontradicted and unimpeached, at least to

the extent that that evidence comes from disinterested witnesses." Reeves v.

Sanderson Plumbing Prods., 530 U.S. 133, 151 (2000) (quoting 9A C. Wright &

A. Miller, Federal Practice & Procedure § 299 (2d ed. 1995).

When considering cross-motions for summary judgment, the Court

considers each motion separately, applying the standard set forth above. See

Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir.

2001) (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)

(cross-motions for summary judgment "are no more than a claim by each side that

it alone is entitled to summary judgment"); Benckini v. Hawk, 654 F. Supp. 2d

310, 315 (E.D. Pa. 2009). The Court cannot view "facts" in the light most

favorable to two nonmoving parties simultaneously, and in some cases the best

course may be to recite two statements of "facts" for the same case or even to

write entirely separate opinions disposing of the respective motions. See

<u>Interbusiness Bank, N.A. v. First Nat'l Bank of Mifflintown</u>, 318 F. Supp. 2d 230, 236 (M.D. Pa. 2004). The Court in this case has written a single opinion with a single recitation of the facts because the factual disputes between the parties are few.

## III.   Factual Background[1]

The following recitation of facts is derived primarily from the parties's statements of material facts and admitted portions of the amended complaint. (Rec. Doc. Nos. 6, 30, 33, 37 & 39). The facts are undisputed unless noted.

Plaintiff Karl Markowicz has been a college professor in Williamsport, Pennsylvania for 27 years. (Rec. Doc. No. 33 ¶ 1). He is the son of Beverly Markowicz. (<u>Id.</u> at ¶ 8).

---

[1] Procedurally, this case was removed to this Court from the Court of Common Pleas of Tioga County on March 8, 2011. (Rec. Doc. No. 1).This Court has jurisdiction under 28 U.S.C. § 1332 and the dispute is governed by Pennsylvania law. Plaintiff filed an amended complaint on May 12, 2011 (Rec. Doc. No. 6), and defendants SWEPI and Ultra answered on July 22, 2011 (Rec. Doc. No. 13). After discovery, defendants filed a motion for summary judgment on July 31, 2012 (Rec. Doc. No. 29), and papers in support (Rec. Doc. Nos. 30 & 31). Plaintiff Markowicz filed his own motion for summary judgment on the same day (Rec. Doc. No. 32), and his own papers in support (Rec. Doc. Nos. 33 & 35). Markowicz filed further papers in opposition to defendants's motion on August 21, 2012 (Rec. Doc Nos. 36 & 37), and defendants filed papers in opposition to Markowicz's motion on September 4, 2012 (Rec. Doc. Nos. 38 & 39). Markowicz filed final papers in support of his motion on September 18, 2012. (Rec. Doc. No. 40).

At the center of this litigation is a 46 acre property in Delmar Township, Tioga County, Pennsylvania (the "46 acres"), where Beverly grew up. (Rec. Doc. Nos. 31 ¶ 1; 33 ¶ 10). Beverly later moved to another residence that factors prominently in this controversy, a home approximately three miles away from the 46 acres on Pearl Street in Wellsboro, Pennsylvania (the "Pearl Street residence"). (Rec. Doc. No. 33 ¶¶ 9). The Pearl Street residence is where Beverly raised Karl (Id. at ¶¶ 6, 7), and where she has lived for the past 60 years, (Id. at 33 ¶ 9).

Although he has not lived at the Pearl Street residence for some time (Id. at ¶¶ 4, 5), Karl's "legal address" and the address at which he receives his mail is – and at all relevant times has been – Beverly's Pearl Street residence. (Id. at ¶ 6). Karl explains that "he kept that address as his legal residence when he moved to attend college and find employment as a way for him to be reached and receive mail." (Id. at ¶ 7). He is not, however, often physically present at the address, and does not normally retrieve his mail from the mailbox. (Id. at ¶12). Beverly gets the mail for Karl. (Rec. Doc. No. 31 ¶ 30).

The parties dispute the degree to which Beverly manages Karl's other affairs. Karl testified that Beverly was at one time authorized by power of attorney to "sign my checks and put them in my checking account" at Citizens & Northern Bank, but otherwise lacked authority to manage his affairs. (Rec. Doc.

5

No. 33-2 at 29). Defendants point to Beverly's testimony that she handled her son's finances "at times when needed" to argue that Beverly's authority was broader. (Rec. Doc. No. 31-9 at 36). The parties agree that Beverly does Karl's taxes. (Rec. Doc. No. 31 ¶ 45).

It is also agreed that in 1988 Karl purchased a one-half undivided interest in the 46 acres from Charles Stadler, Beverly's stepbrother, and Charles's wife Florence ("Karl's half interest"). (Rec. Doc. Nos. 31 ¶ 1; 33 ¶ 23). The other one-half undivided interest in the 46 acres was at that time owned by Beverly ("Beverly's half interest"). (Rec. Doc. No. 31 ¶ 2).

Karl and Beverly owned the 46 acres as tenants in common until Beverly conveyed her half interest to Karl on or about November 30, 2005, making Karl the sole owner of the subject property. (Rec. Doc. Nos. 31 ¶¶ 3, 9; 33 ¶ 31). Karl came to reside on the 46 acres in 1998 and has lived there ever since. (Rec. Doc. No. 33 ¶ 4, 5).

The defendants in this case – Ultra and SWEPI – are firms engaged in oil and gas exploration and production. (Id. at ¶¶ 14-18). The dispute between the parties involves the validity of an oil and gas lease that allows the defendants to explore and exploit the 46 acres for oil and gas. (Rec. Doc. Nos. 31 ¶ 4; 33 ¶ 5).

On September 21, 2005, leasing agent Michael Reese visited Beverly at the

6

Pearl Street residence on defendant Ultra's behalf and obtained the lease in question under circumstances that are in controversy. (Rec. Doc. No. 33 ¶ 51). What is not in genuine dispute is that the lease purports to have been "made and entered into" on September 21, 2005 (Rec. Doc. No. 31-4 at 2) by Beverly and Karl as lessors of the 46 acres, and Ultra as lessee. (Rec. Doc. No. 31 ¶ 8).[2] The Acknowledgment associated with the lease shows notarized signatures of Beverly and Karl, but the parties agree that "Karl was not present when Reese was at Beverly's residence or when she signed the document Reese had given her." (Rec. Doc. No. 33 ¶ 51). Beverly signed for herself and – with or without authorization, a matter that is in dispute – Karl. (Rec. Doc. Nos. 33 ¶ 46, 52; 31 ¶ 31). Only Reese and Beverly – and not the notary – were present. (Id. at ¶¶ 56-58).

Karl claims that Beverly was deceived by Reese. Specifically – in testimony that defendants deny, but are apparently without a witness to meaningfully corroborate or deny – when Michael Reese arrived at the Pearl Street residence on September 21, 2005, Beverly was then in the process of settling her deceased mother's estate (Rec. Doc. No. 33-3 at 9), which included a lease with Ultra.

---

[2] Ultra subsequently assigned fifty percent of its interest in the oil and gas lease of the 46 acres to an entity of which SWEPI is the successor in interest. (Id. at ¶¶ 11, 12). Today ownership of the lease is split between defendants Ultra and SWEPI fifty-fifty.

Reese told Beverly he was visiting in relation to her mother's estate and her mother's lease with Ultra. (Id. at 8-9). He instructed Beverly to sign a document on his clipboard, a single sheet of paper folded in such a way that only a space for Beverly's signature was visible. (Id. at 8). She signed without asking to see the document, thinking she was signing not a new gas lease, but a document pertaining to her mother's estate. (Id. at 8-9). She wrote Karl's name and signed Karl's signature on the lease so that he could be contacted if anything happened to her. (Id. at 8).

The initial term of the lease was five years from September 21, 2005, but the lease also provides that the property can be "held by production," which is to say that once defendants commence "drilling operations" on the 46 acres or on other properties with which the 46 acres have been "unitized," the term of the lease is indefinitely extended. (Rec. Doc. Nos. 31 ¶ 7; 37 ¶ 7). Defendants claim the 46 acres, by virtue of drilling operations commenced on property with which the 46 acres have been unitized, are held by production. (Rec. Doc. No. 30 at 10).

It is not disputed that shortly after Beverly signed it, the lease was recorded with the Tioga County Recorder of Deeds on November 7, 2005. (Rec. Doc. No. 31 ¶ 5). Just subsequent to the recording of the lease with the Recorder of Deeds, Beverly, on November 30, 2005, conveyed her half interest in the 46 acres to Karl,

8

making him the sole owner. (Id. at ¶¶ 9, 10). Karl did not have a title search performed on the 46 acres at the time of the conveyance. (Id. at ¶ 16).

Beverly did not receive a copy of the lease at the time of Michael Reese's visit to the Pearl Street residence; on December 2, 2005, she wrote to Ultra – again signing Karl's name, as she did on all correspondence with defendants (Id. at ¶ 44) – requesting a copy. (Id. at ¶¶ 32-33). She received a copy that month, together with a Christmas card from Ultra. (Id. at ¶ 34). "[F]rom 2005 to the present," she also received all "delay rental payments" due according to the terms of the lease (Id. at ¶ 43). She told Karl that she received such a delay rental check as early as 2005, and Karl told her to keep the proceeds. (Rec. Doc. No. 31-9 at 13-14). Beverly testified that she kept the proceeds because "it was the same situation as before [sic] I was to keep the money because it was for my mother's estate." (Id. at 16). Beverly recalls receiving another check from Ultra in 2006 or 2007, "but it was the same situation as before [sic] I was to keep the money because it was for my mother's estate." (Id. at 15-16). At some point, however, she stopped cashing checks received from Ultra. (Rec. Doc. No. 31 ¶ 38).

Defendants claim Karl received a letter from them dated April 14, 2010, which prompted him to authorize his mother to correspond with the defendants regarding the lease. (Id. at ¶¶ 17-19). Karl claims, however, that he did not learn

9

of the lease until receiving a November 9, 2010 letter from Ultra. (Rec. Doc. No. 37 ¶ 18). Be that as it may, it is undisputed that "[o]nce Karl learned of the lease . . ., he authorized Beverly to communicate with [defendants] regarding the lease on his behalf." (Id. at ¶ 18). Beverly wrote letters to the defendants regarding the lease on September 27, 2010 and November 3, 2010 (Rec. Doc. Nos. 31 ¶¶ 21, 22; 37 ¶ 25). Neither questions the validity of the lease. Karl "did not see or sign [at least the second] letter because he says he was confident that his mother would articulate his position" – i.e., that there was no valid lease. (Rec. Doc. No. 33-2 at 38, 40). Karl filed the original complaint in this case on February 4, 2011. (Rec. Doc. No. 1 at 1).

## IV.   Defendants' Motion for Summary Judgment is Granted

Pennsylvania long has been recognized as counting among the majority of states permitting "a cotenant in the fee . . . to explore for and produce oil and gas without consent of his cotenants." Eugene Kuntz, A Treatise on the Law of Oil and Gas § 5.3 (Matthew Bender, Rev. Ed.). See also Patrick H. Martin and Bruce M. Kramer, Williams & Meyers, Oil and Gas Law § 502 (LexisNexis Matthew Bender 2012) (including Pennsylvania among "a majority of the producing states [in which] a concurrent owner, at least under some circumstances, has been given the power to lease and develop his interest in the land concurrently owned," and

10

explaining that the "non-consenting cotenant is legally disabled from enjoining the drilling cotenant's operations"); Lichtenfels v. Bridgeview Coal Co., 344 Pa. Super. 257, 263, 496 A.2d 782, 785 (1985) ("Another special rule relating to the mineral estate is that a tenant cannot restrain a cotenant with an undivided interest in the land from realizing the value of the estate by producing or consuming the underlying minerals.").

The analysis is not changed by the cotenant's choice to lease his or her exploration and production rights to another. See McIntosh v. Ropp, 233 Pa. 497, 512, 82 A. 949, 954 (1912) ("The fact that the actual operations were carried on by third parties under a lease, and not directly by [the cotenant], would not serve to make the [lessees] trespassers, or to cause them to be regarded other than as cotenants."). Where one cotenant is party to a mineral lease and the other is not, the "usual rule where there are no facts showing intentional wrong" simply compensates (according to his interest) the tenant who is not a party for the fair value of the minerals extracted by the lessee. McIntosh, 233 Pa. at 513, 82 A. at 954.

Karl does not cite any contrary authority. Accordingly his arguments directed towards establishing that "[t]he September 21, 2005 lease is not a valid and enforceable contract concerning [his] half-interest in the 46-acre parcel" –

11

purportedly "because he never agreed to enter into [the lease], never authorized his mother to do so on his behalf, and never ratified her actions" (Rec. Doc. No. 36 at 10) (emphasis added) – are largely beside the point. If Beverly – as then-owner of an undivided half interest in the 46 acres as tenant-in-common with Karl – entered into the September 21, 2005 lease with defendants, Karl's noninvolvement does not provide a basis for declaring the agreement void in its entirety. Neither Karl's agreement to enter into the lease, nor the authorization of his mother to do so on his behalf, was necessary to create a valid agreement giving defendants the right to explore and exploit the 46 acres for oil and gas. Beverly's consent was enough.

Karl claims, however, that the Court should still deny defendants' motion because Beverly was fraudulently induced to sign the September 21, 2005 lease, and therefore the agreement should be voided despite her apparent assent.

There is a fundamental problem with this argument: even assuming he can establish that Beverly was fraudulently induced to enter into the lease, Karl is in no position to ask the Court to void it. As Karl recognizes, a contract entered into as a result of fraudulent inducement is not void but merely voidable. (Pl.'s Br., Rec. Doc. 36 at 16, citing Gilmore v. Ne. Dodge Co., Inc., 278 Pa. Super. 209, 214, 420 A.2d 504, 506 (1980)). "A contract secured by fraud is voidable only at the option of the injured party, who must act promptly on the discovery of the

12

fraud or the right to rescind is waived." Sixsmith v. Martsolf, 413 Pa. 150, 152, 196 A.2d 662, 663 (1964). Thus, even assuming that Beverly's agreement with defendants was fraudulently induced – a question the Court discusses below – Karl nevertheless is not entitled to the relief he seeks if he has not properly exercised his right to rescind. The Court is convinced that he has not.

First – an issue the Court expected the parties to raise – it is unclear whether Pennsylvania law permits Karl to rescind a lease conveyed to him by Beverly (as an incident of Beverly's November 30, 2005 conveyance to Karl of her half-interest in the 46 acres) on the ground that Beverly was defrauded. In the only Pennsylvania case the Court has found that speaks to the issue, Peoples Pittsburgh Trust Co. v. Commonwealth, 359 Pa. 622, 60 A.2d 53 (1948), the Supreme Court of Pennsylvania was confronted with the claim of Peoples Pittsburgh Trust ("Trust"), assignee of $7,494 in invoices originally to be paid by the Pennsylvania Liquor Control Board ("LCB") to assignor Ruffsdale Distilling Company ("Distilling"). Defendant LCB replied that it owed nothing to Trust because it was entitled to a set-off in the amount of $8,634 for certain services LCB had rendered to Distilling, and for which Distilling had failed to pay, prior to Distilling's assignment to Trust. Trust, in turn, argued that LCB was not entitled to a set-off because – again, prior to the assignment to Trust – LCB had fraudulently induced

13

Distilling to agree to pay LCB $8,634 in so-called "quantity discounts," which Distilling had indeed paid. Trust claimed that it, as Distilling's assignee, was entitled to a refund of the $8,634 in fraudulently induced quantity discounts, eliminating LCB's set-off. The Supreme Court rejected Trust's claim in terms suggesting that the right to rescind an agreement is not assignable in Pennsylvania:

> Even if there were any right on the part of the Distilling Company to rescind the agreement in regard to the quantity discounts and to secure a refund of the payments made thereunder, that right would be wholly personal to the Distilling Company and could be invoked by it alone. . . . Even were the claim for rescission and for refund assignable it was not in fact assigned to the Trust Company, which was the transferee only of the invoices assigned as collateral on the Distilling Company's notes, and if such claim passed to any one it passed to the Distilling Company's trustee in bankruptcy by operation of law, and there is no basis whatever for the Trust Company's assertion of any right in regard thereto.

Peoples Pittsburgh, 359 Pa. at 629, 60 A.2d at 56-57.[3] Applying the reasoning of Peoples Pittsburgh to the case at bar, Beverly's right to rescind her lease of the 46 acres on the ground she was defrauded was "wholly personal," and did not survive her transfer of the lease to Karl.

But even assuming the rescission remedy did survive the transfer, Karl has waived his right to exercise it. A litigant seeking rescission of a contract "must act

---

[3]These were listed by the Supreme Court among the "several reasons" Trust's claim failed. Id.

14

promptly on the discovery of the fraud or the right to rescind is waived." <u>Sixsmith</u>, 413 Pa. at 152, 196 A.2d at 663. As for the meaning of "promptly" in this context, the Supreme Court in <u>Sixsmith</u> explained that filing an action for rescission "more than 25 months after the [transaction] was consummated[] is legally too late." <u>Id</u>. <u>See also Schwartz v. Rockey</u>, 593 Pa. 536, 547, 932 A.2d 885, 892 n.7 (2007) (citing cases applying requirement of prompt rescission).

Karl filed this suit for rescission more than 50 months after he was put on notice of the lease and its terms. Although Karl asserts that he was unaware of the lease on the 46 acres until sometime in 2010, by operation of Pennsylvania law he was on notice by the end of 2005. It is undisputed that defendants recorded the lease on November 7, 2005, and "[t]he recording of any such lease . . . constitute[s] constructive notice to subsequent purchasers . . . of the lessor of the making and of the provisions of such lease . . . ." 21 P.S. § 407 ("Effect of recording lease, sublease, agreement or memorandum"). Karl was one such subsequent purchaser when Beverly transferred her interest in the 46 acres to him on November 30, 2005, and he was under an obligation to protect his own interests by inspecting the records. <u>See generally Finley v. Glenn</u>, 303 Pa. 131, 135-36, 154 A. 299, 301 (1931). He neglected to do so, but is nevertheless credited with having purchased on notice of the lease – "otherwise the purpose of

15

the recording acts would be frustrated." Id. Having filed this suit on February 4, 2011, he is "legally too late" to void the contract. Defendants are entitled to summary judgment on the validity Beverly's lease of her half interest.

For similar reasons, even assuming that Beverly was acting outside the scope of her authority when she signed the lease on Karl's behalf, the Court holds that Karl ratified the agreement with Ultra as to his half interest as well. As Karl recognizes (see Pl. Br., Rec. Doc. No. 36 at 12)), the doctrine of ratification "binds a principal to an unauthorized agent's acts if the principal knows of the acts but fails to take affirmative steps to disavow them." Residential Reroofers Local 30 Health & Welfare Fund of Philadelphia & Vicinity v. A & B Metal & Roofing, Inc., 976 F. Supp. 341, 346 (E.D. Pa. 1997). The undisputed facts show that Karl not only failed to take affirmative steps to disavow the lease until (at best) late 2010, he also effectively accepted its benefits when he – albeit as a result of a misapprehension – transferred to Beverly delay rental checks that Ultra dispensed pursuant to the terms of the lease.

Karl argues that the doctrine of ratification does not count against him because he did not know of the lease until 2010. (See Pl. Br., Rec. Doc. No. 36 at 13-14). But this assumes that Karl must have had actual knowledge of the lease in order to ratify it. The Court disagrees. Constructive knowledge is sufficient, at

least where, as here, it arises from a duty to put oneself on notice. See Kann v. Keystone Res., Inc., 575 F. Supp. 1084, 1092 (W.D. Pa. 1983) ("Even if he did not have actual knowledge, he had constructive knowledge . . .. Since he did not promptly disavow this action, he must be deemed to have ratified it."). See also In re Shoemaker, 277 Pa. 424, 429, 121 A. 510, 512 (1923) ("[W]hen a party with full knowledge, or with sufficient notice or means of knowledge, of his rights and all the material facts, remain [sic] inactive for a considerable time or abstains from impeaching the transaction, so that the other party is induced to suppose that it is recognized, this is acquiescence, and the transaction, although originally impeachable, becomes unimpeachable." (emphasis added)). Since defendants recorded the lease, putting Karl on notice of the "making and of the provisions of such lease" when Beverly transferred her half interest to him, 21 P.S. § 407, his inaction and occasional acceptance of the lease's benefits over the next five years constitutes ratification.

Thus, because Karl waived his right to rescind the agreement arising from the fraud against Beverly, and because he ratified the act of his agent, Beverly, in entering into the lease with defendants on his behalf, Karl's request for an Order declaring the lease void in its entirety must be denied. Defendants are entitled to summary judgment.

17

## V. Markowicz's Motion for Summary Judgment is Denied

As his first ground for summary judgment in his favor, Karl asserts that the undisputed facts show that the lease is invalid as to his half interest because he never agreed to enter into the lease, and did not authorize Beverly to do so on his behalf. Defendants do not dispute that Karl did not personally enter into the lease. They do assert that Beverly was authorized to bind Karl, but the Court need not resolve whether defendants raise a genuine dispute of material fact on this particular issue since the Court holds that Karl ratified the agreement with defendants.

Karl also asserts that he is entitled to summary judgment because the undisputed facts show that Beverly was fraudulently induced to sign the lease, and thus the lease is invalid as to Beverly's half interest. Even had the Court not already decided that Karl waived any opportunity he may have had to rescind the lease on this ground, summary judgment would be inappropriate for at least two reasons.

First, Karl has the burden of proving that Beverly was fraudulently induced. See Young v. Kaye, 443 Pa. 335, 342, 279 A.2d 759, 762 (1971) (noting the "general rule that a party seeking to avoid or undo a contract on the basis of fraud bears the burden of proving fraud"). Although defendants have adduced no

18

evidence to refute Beverly's testimony regarding the circumstances of her signing the lease on September 21, 2005, Beverly, as Karl's mother, is not a disinterested witness. To determine whether Karl has met his burden, a jury needs to assess the credibility of Beverly's claim that she was misled into signing a document that she thought somehow pertained to her mother's estate. And defendants are not without potential impeaching evidence. They point out, for example, that Beverly's credibility is put in question by her letter to Ultra on November 3, 2005, asking for "a copy of our lease with you that we signed with . . . Reese on September 20, 2005 for four years," as well as her failure to contest the lease after it was sent to Pearl Street in December 2005. (Defs.' Br., Rec. Doc. No. 38 at 6; Rec. Doc. No. 31 ¶¶ 32-34; Rec. Doc. No. 31-11 at 2). It almost goes without saying that the Court cannot resolve issues of Beverly's credibility in Karl's favor at the summary judgment stage.

Second, it is hardly clear that Karl can satisfy all of the elements of his fraudulent inducement claim. A plaintiff alleging fraudulent inducement must prove that the defendant made "(1) a representation; (2) which [was] material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it [was] true or false; (4) with the intent of misleading [plaintiff] into relying on it; (5) justifiable reliance on the misrepresentation; and

(6) resulting injury proximately caused by the reliance." <u>Porreco v. Porreco</u>, 571 Pa. 61, 69, 811 A.2d 566, 570 (2002). (See also Pl. Br., Rec. Doc. No. 35 at 11-12). "[J]ustifiable reliance is typically a question of fact for the fact-finder to decide," as it requires "a consideration of the parties, their relationship, and the circumstances surrounding their transaction." <u>Toy v. Metro. Life Ins. Co.</u>, 593 Pa. 20, 55, 928 A.2d 186, 208 (2007). Karl cites no authority differentiating this case from the "typical" one that must be resolved by the jury. And at best, the relevant discussion in his brief[4] establishes that jurors <u>might</u> reasonably conclude that Beverly justifiably relied on Reese's representations; the Court cannot say that they would be compelled to do so. Indeed, Beverly's failure to so much as ask Reese whether she could read the document before she signed it makes it at least a close question whether summary judgment should be ordered for <u>defendants</u> on

---

[4] Karl argues: "Beverly justifiably relied on Reese's representation as to the document's nature and purpose. Reese told Beverly that he was with the gas company. He also knew that Beverly's mother had a gas lease with Ultra Resources concerning the 46-acre parcel. Reese's purported position and knowledge about the old gas lease would reasonably allow Beverly to conclude that he also knew that not all of the payments under that lease had been made. Beverly could then reasonably believe that Reese was there on behalf of Ultra Resources to tie up the loose ends concerning her mother's lease. It would also be reasonable for Beverly to want to do this. At the time, Beverly was in the process of settling her mother's estate. The payments due under the old lease would be part of that estate. Signing the document would kill two birds with one stone – it would wrap up the old lease and get one more matter that needed to be addressed concerning the estate taken care of." (Pl. Br., Rec. Doc. No. 35 at 12-13).

the issue of justifiable reliance. See Yohe v. Yohe, 466 Pa. 405, 410, 353 A.2d
417, 420 (1976) ("'If a party, who can read, will not read a deed put before him for
execution . . . he is guilty of supine negligence, which . . . is not the subject of
protection, either in equity or at law.'") (quoting O'Reilly v. Reading Trust Co.,
262 Pa. 337, 343, 105 A. 542, 544 (1918)). In any case, summary judgment in
Karl's favor is not warranted.

Finally, the Court notes that Karl, in alleging fraudulent inducement, invites
the Court to conclude that the parol evidence rule precludes consideration of any
oral representations Reese may have made concerning the lease. See generally
1726 Cherry St. P'ship v. Bell Atl. Properties, Inc., 439 Pa. Super. 141, 653 A.2d
663 (1995) (discussing the distinction between claims of fraud in the inducement
and fraud in the execution, and concluding that parol evidence is inadmissible in
relation to the former). Other jurists have found that analysis of the relevant
precedents in this area fails to "yield a perfectly consistent set of principles," 1726
Cherry St., 439 Pa. Super. at 151, 653 A.2d at 668, and our own Court, speaking
through the Honorable Richard P. Conaboy, has lamented that, "[w]hile
Pennsylvania courts have extensively discussed the operation of the parol
evidence rule related to [misrepresentation] claims, their pronouncements on the
matter are far from clear." Cabot Oil & Gas Corp. v. Jordan, 698 F. Supp. 2d 474,

476 (M.D. Pa. 2010). Indeed, in <u>Cabot Oil</u>, the Court exercised its discretion in declining to issue declaratory judgment on a claim that raised the same question at issue here – "whether [an oil and gas] agreement should be rescinded based on fraudulent inducement" – because the application of the parol evidence rule was unclear, reasoning that in light of the "potential broad impact on the matters of state law presented . . .[,] the state courts should make such vital determinations." <u>Id.</u> at 479. Similarly here, since the Court is able to resolve the motions on other grounds, the Court will decline to rule on the application of the parol evidence rule to the matter at hand.

## VI.    Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted; plaintiff's is denied. An order follows.

s/ Matthew W. Brann<br>
Matthew W. Brann<br>
United States District Judge